# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GEOFFREY HARRIS,                          )
                                          )
    Plaintiff/Counter-Defendant,      )    Case No. 09 C 2354
                                          )
    v.                                )    Judge Edmond E. Chang
                                          )
CENTRAL GARDEN & PET COMPANY,             )
                                          )
    Defendant/Counter-Plaintiff.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Geoffrey Harris seeks a judicial declaration that the non-compete agreement he entered into with his former employer, Defendant Central Garden & Pet Company, is unenforceable under Illinois law. Harris also seeks to recover a $100,000 bonus payment from Central pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.*[1] Central counterclaims, asserting that the non-compete should be declared valid and enforceable. Central also filed a counterclaim for breach of contract. The parties have filed cross-motions for summary judgment. R. 80, 84. For the reasons discussed below, Harris's motion is granted in part and denied in part; Central's motion is denied.

---

[1]In paragraph 4 of the Amended Complaint, R. 20, Harris alleges that "[t]he Court has subject matter jurisdiction over the instant cause of action based on diversity jurisdiction pursuant to 28 U.S.C. §1332, since the controversy is between *citizens* of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." (emphasis added). But Harris also alleges that he "is an individual residing at 130 N. Garland Court, Chicago, Illinois 60602." R. 20 ¶ 2. A "resident" of Illinois is not the same as a "citizen" of Illinois, and diversity jurisdiction requires diversity of citizenship. *Hunter v. Amin*, 583 F.3d 486, 491 (7th Cir. 2009). At the next status hearing, Harris must clarify that he is a citizen of Illinois, and if so, the Court will accept an oral motion to treat the Amended Complaint as so alleging. Central's Amended Counterclaim, R. 63, properly alleges diversity.

# I.

In 1993, Harris formed Bethlehem Lights, Inc., an Illinois corporation that distributed pre-lit Christmas trees, wreaths, and other seasonal foliage that it designed and imported from overseas manufacturers and then sold to a variety of retailers throughout the United States. R. 91, Pl.'s Stmt. of Facts (PSOF) ¶ 7. As the President of Bethlehem Lights, Harris located and developed relationships with several suppliers in China, Hong Kong, Thailand, and Taiwan. PSOF ¶ 8. In 1996, Harris developed a customer relationship with the QVC Network, a direct response television retailer, and regularly appeared on the air as Bethlehem Lights's spokesperson to describe and sell Bethlehem Lights products between 1996 and 1999. PSOF ¶ 9. In 1999, Harris sold the assets of Bethlehem Lights to New England Pottery (NEP), a distributor of similar holiday decor items, as well as decorative pottery, ornamental containers, and garden accessories. PSOF ¶ 11. Harris agreed to stay on as an employee of NEP, subject to a five-year employment agreement. PSOF ¶ 12. As an employee of NEP, Harris continued to work with the suppliers and customers he developed for Bethlehem Lights and appeared on QVC to describe and sell the products. PSOF ¶ 14.

On January 23, 2004, Central agreed to purchase the assets of NEP and executed an asset purchase agreement with NEP memorializing the terms of the transaction. PSOF ¶ 15. Harris did not participate in the negotiations between Central and NEP; he was neither a party nor a signatory to the asset purchase agreement. PSOF ¶ 15. Four days later, on January 27, Harris entered into an employment agreement with Central. PSOF ¶ 20. On February 26, 2004, the Central-NEP deal

closed and Central acquired the assets of NEP pursuant to the asset purchase agreement. PSOF ¶ 19. The same day, Harris signed a non-compete agreement with Central, which prohibited Harris from working in the holiday decor industry, or any of the other industries in which Central operates, for the duration of his five-year employment term with Central, as well as for five years following the end of his employment with Central. PSOF ¶ 21.

Central is in the business of producing and marketing lawn and garden, home, and pet supply products. R. 82, Def.'s Stmt. of Facts (DSOF) ¶ 5. As part of this business, Central sells Christmas lights and other holiday products under the brand name GKI/Bethlehem Lighting. DSOF ¶ 7. During his employment with Central, Harris worked exclusively within the GKI/Bethlehem Lighting division. PSOF ¶ 22. Harris brought his business relationships with overseas manufacturers and retailers in the United States to Central. PSOF ¶¶ 37-38. In particular, Harris brought his relationship with QVC to Central and, as a Central employee, he continued to have primary responsibility for selling GKI/Bethlehem Lighting holiday decor to QVC. PSOF ¶ 30. Harris did not solicit or sell to other direct response television retailers, such as ShopNBC or HSN, because GKI/Bethlehem Lighting is contractually prohibited from selling its seasonal decor products to these retailers. PSOF ¶¶ 34-35. In contrast, QVC purchases comparable Christmas and seasonal decor products from other suppliers, including Central's competitors. PSOF ¶ 31. Indeed, Central is one of hundreds of companies importing and selling Christmas and other seasonal decor products to retailers throughout the United States. PSOF ¶ 24. Central routinely seeks products

for its GKI/Bethlehem Lighting product line that are copied from seasonal decorations already being sold by competitors in the marketplace. PSOF ¶ 26. And, on more than one occasion, QVC has asked Central to duplicate products being sold by other retailers in the marketplace. PSOF ¶ 27. Likewise, once Central sells a GKI/Bethlehem Lighting product in the marketplace, it can be readily duplicated, or reverse-engineered, by competitors seeking to sell a comparable product. PSOF ¶ 52.

During Harris's employment with Central, none of Central's overseas suppliers maintained an exclusive relationship with Central. PSOF ¶ 39. Rather, Central's suppliers openly sold Christmas and other seasonal decorations to Central's competitors and customers.[2] PSOF ¶ 39. GKI/Bethlehem Lighting's suppliers are not prohibited from sharing information about orders placed by Central or their other customers. PSOF ¶ 53. In fact, within the industry, suppliers frequently share such information amongst their customers and potential customers, as well as with subcontractors who may manufacture component parts. PSOF ¶ 53. The same is true for Central's customers. PSOF ¶ 56. During Harris's employment, Central did not have confidentiality or non-disclosure agreements with QVC or any of its other GKI/Bethlehem Lighting customers under which the customers agreed to maintain the confidentiality of Central's business information and not disclose it to any third party. PSOF ¶ 56. While Harris's employment agreement with Central contains a

_____

[2]In March and April 2010, GKI/Bethlehem Lighting, for the first time, signed exclusivity agreements with two of its suppliers with respect to certain products. PSOF ¶¶ 50-51.

confidentiality provision, he was the only GKI/Bethlehem Lighting employee required to sign an agreement to maintain Central's purportedly confidential information. PSOF ¶ 42. Other GKI/Bethlehem Lighting employees privy to Central's cost and pricing information were not required to sign non-compete or confidentiality agreements. PSOF ¶¶ 43-45.

Harris's employment agreement with Central was scheduled to expire on January 27, 2009. PSOF ¶ 23. Before the contract expiration, and for several months thereafter, the parties continued to negotiate a new employment contract. DSOF ¶ 14. The parties agreed to maintain and continue the terms of Harris's employment agreement while they attempted to negotiate a new agreement. PSOF ¶ 23. In some of the same meetings where Harris and Central discussed the terms of a future employment agreement, the parties also discussed paying Harris a $100,000 bonus for his work in 2008.[3] R. 126, Pl.'s Resp. DSOF ¶ 15. For instance, in late October 2008, Harris met with Central executives William Brown and Stanley Bulger regarding Harris's new employment contract. DSOF ¶ 16. During that meeting, Harris requested that, in addition to his annual salary, Central pay him a $100,000 bonus for his performance in 2008. DSOF ¶ 17. This figure was written on a whiteboard, along with the proposed terms of Harris's new employment contract. DSOF ¶ 19. Harris and Brown did not discuss the method or timing of the payment for the bonus at the October 2008 meeting. DSOF ¶ 21. However, in January 2009, Central informed

---

[3]Harris was not entitled to a bonus under his employment agreement with Central, nor was the proposed $100,000 bonus part of a formal company bonus program. DSOF ¶¶ 12, 22.

Harris that he would receive his 2008 bonus in the form of restricted stock. Pl.'s Resp. DSOF ¶ 24. On February 2, 2009, Harris notified Central that he did not consent to receiving his bonus in restricted stock; rather, he expected a check in the amount of $100,000. Pl.'s Resp. DSOF ¶ 25. Central placed Harris's bonus payment on hold, and proceeded to pay other employees' 2008 bonuses in the form of restricted stock. Pl.'s Resp. DSOF ¶ 27.

Ultimately, Harris and Central were unable to reach an agreement regarding Harris's continued employment, and Harris resigned from Central on April 17, 2009. PSOF ¶ 23. On the same day, Harris filed this lawsuit against Central. See R. 1. Harris continues to work in the Christmas and seasonal decor business. Def.'s Resp. PSOF ¶ 61.

## II.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The same standard applies to cross-motions for summary judgment. *Int'l Bhd. of Elec Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd.*

*v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). The evidence presented at this stage must comport with the Federal Rules of Evidence and be admissible at trial, *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010), or it must consist of affidavits or declarations "made on personal knowledge, set[ting] out facts that would be admissible in evidence, and show[ing] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The court does not assess the credibility of witnesses or weigh evidence, *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005), and will not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.

### A.

#### 1.

Under Illinois law,[4] "restrictive covenants are carefully scrutinized to ensure that they are connected to legitimate business interests, and not simply intended to stifle competition." *Loewen Group Int'l, Inc., Haberichter*, 912 F. Supp. 388, 392 (N.D. Ill. 1996). The framework Illinois courts apply to a particular covenant depends on whether the covenant not to compete is ancillary to an employment agreement or a sales agreement. Reflecting wariness of restricting individual employment

---

[4]The parties agree that Illinois law governs this dispute. The non-compete agreement provides that it "shall be governed by and construed in accordance with the laws of the State of Illinois." R. 91-9, Pl.'s Exh. 7.

opportunities, greater scrutiny applies to a covenant that is ancillary to an employment agreement than to a covenant ancillary to a sales agreement. A covenant ancillary to an employment agreement will be enforceable only if the employer (1) shows that the restriction is reasonable in duration, geographical area, and scope of prohibited business activity, and (2) demonstrates either a near-permanent relationship between the employer and its customers, and that but for his association with the employer, the former employee would not have had contact with the customers, or the acquisition and attempted use of confidential information by the employee. *Loewen*, 912 F. Supp. at 392-93 (citing *Audio Props., Inc. v. Kovach*, 655 N.E.2d 1034, 1037 (Ill. App. Ct. 1995)); *Hamer Holding Group v. Elmore*, 560 N.E.2d 907, 915-16 (Ill. App. Ct. 1990). In contrast, a covenant ancillary to the sale of a business need only be reasonable in duration, geographical area, and scope to be enforceable. *Id.* Thus, as a threshold matter, the Court must determine what type of covenant is at issue in this case (and whether that question is resolvable by summary judgment motion).

Harris argues that the non-compete agreement he signed on February 26, 2004 was ancillary to his employment with Central. R. 117-1 (Pl.'s Br.) at 4-6. Central takes the opposite position and urges the Court to find that the non-compete was ancillary to its acquisition of NEP. R. 127 (Def.'s Resp. Br.) at 6-7. The Court agrees with Harris. "Although no specific test has been established for determining whether a noncompetition agreement is ancillary to the sale of a business, courts addressing this issue generally focus on facts demonstrating the intent of the parties to protect the integrity of the sale, such as requiring execution of the agreement as a condition

precedent to the sale, and identifying the agreement as a necessary closing document." *Health Prof'ls, Ltd. v. Johnson*, 791 N.E.2d 1179, 1189-90 (Ill. App. Ct. 2003); *see Hamer Holding Group*, 560 N.E.2d at 916 (holding non-compete ancillary to sale of business where transaction would not proceed unless employee executed non-compete).

Here, Harris correctly points out that the Central-NEP asset purchase agreement did not incorporate Harris's non-compete agreement, nor did it identify the non-compete as a prerequisite to closing the deal. Pl.'s Br. at 5 (citing R. 91-7, Pl.'s Exh. 5). To the contrary, the asset purchase agreement contained affirmative representations and warranties by Central that it had no extraneous agreements or arrangements with any NEP employee, and that no NEP employee had made any representation or warranty to Central outside the four corners of the asset purchase agreement. *Id.* Harris's non-compete was not a condition precedent to the sale of NEP. Once Central executed the asset purchase agreement on January 23, 2004, it became obligated to complete the purchase of NEP's assets regardless of whether Harris agreed to become a Central employee and sign the non-compete agreement.

To counter the clear terms of the asset purchase agreement, Central offers deposition testimony and language from the non-compete agreement, hoping to show that the non-compete was ancillary to Central's purchase of NEP. Def.'s Resp. Br. at 6-7. Central also highlights the sole provision in the asset purchase agreement that mentioned Harris in an effort to link the non-compete agreement to the NEP transaction. *Id.* at 7. However, even viewing all of this evidence in the light most favorable to Central, Central fails to raise a genuine dispute as to any material fact.

9

First, as Harris points out, William Brown's testimony is barred by the parol evidence rule. Brown, Central's CEO, testified that while there was nothing in the asset purchase agreement that required Harris to sign an employment agreement or a non-compete agreement, Central and Harris "had already reached an understanding that [Harris] would be signing the [employment or non-compete] agreement." Def.'s Resp. PSOF ¶ 20. However, the general rule under Illinois contract law is that "if the contract imports on its face to be a complete expression of the whole agreement, it is presumed that the parties introduced into it every material item, and parol evidence cannot be admitted to add another item to the agreement." *Sunstream Jet Express v. Int'l Air Serv. Co.*, 734 F.2d 1258, 1265 (7th Cir. 1984) (internal quotation omitted). The integration provision contained in the Central-NEP asset purchase agreement states that the agreement, together with its exhibits and schedules, "embodies the entire agreement and understanding among the parties" and "supersedes all prior discussions, understandings, and agreements" concerning the transaction. PSOF ¶ 16. In some cases, parol evidence is admissible where the provisions of the parties' written contract – despite an integration clause – are ambiguous. *Farm Credit Bank v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). Central does not contend that the asset purchase agreement is ambiguous, nor does the Court find the agreement to be unclear. Brown's testimony regarding extraneous agreements he allegedly had with Harris is inadmissible.

The second portion of Brown's testimony that Central seeks to rely upon relates to the provision in the asset purchase agreement requiring Central to either purchase

all of NEP's outstanding indebtedness to Harris under the deferred purchase price obligation (which equaled $9,446,856), or obtain a written waiver from Harris permitting NEP to pay certain bonuses arising out of the sale. Def.'s Stmt. of Add'l Facts (DSOAF) ¶ 2; R. 129-1, Def.'s Exh. 7 § 5.2(h) ("Geoff Harris Note"). Brown testified that Central would not have agreed to satisfy such a large outstanding debt obligation without assurance from Harris that he would continue his employment with Central and sign a non-compete agreement. DSOAF ¶ 3. Again, this alleged understanding is not expressed in the fully integrated, unambiguous asset purchase agreement and, thus it too is barred by the parol evidence rule. The deferred purchase price provision, standing alone, does not demonstrate that the non-compete agreement is ancillary to Central's acquisition of NEP. Nor does this provision demonstrate that there is a genuine issue for trial. The asset purchase agreement does not contain any indication that Central viewed Harris's services as an indispensable asset, and would not proceed with the deal without first securing his employment. As part of the asset purchase agreement, Central assumed liability for the Geoff Harris Note. Central's obligation to satisfy this note has nothing to do with Harris's continued employment at Central and the non-compete agreement.

In support of its attempt to hook the non-compete agreement into the asset purchase agreement, Central seizes on one word in Harris's deposition testimony. Specifically, at his deposition, Harris testified that the non-compete agreement he signed was "related" to Central's purchase of NEP's assets. DSOAF ¶ 2. Central argues that Harris's statement dooms his motion for summary judgment on the declaratory

11

judgment claim. Not so. The record shows that Harris testified that the sale of NEP to Central was "related" to the non-compete in the sense that, had Central not purchased NEP, Harris would not have become employed by Central or signed the employment and non-compete agreements. Pl.'s Resp. DSOAF ¶ 2. Similarly, the fact that the non-compete agreement refers to the Central-NEP transaction does not demonstrate that the non-compete is ancillary to the sale of NEP. This evidence does not affect the asset purchase agreement, which proceeded first and separately from the non-compete agreement. For all of these reasons, the Court finds that a reasonable jury could only conclude that the non-compete agreement is ancillary to Harris's employment with Central, not the sale of assets.

**2.**

The next issue is whether the non-compete agreement is enforceable in Illinois, which is a question of law. *Lawrence & Allen, Inc. v. Cambridge Human Resource Group*, 685 N.E.2d 434, 440 (Ill. App. Ct. 1997). A covenant not to compete is enforceable if the terms of the agreement are "reasonable and necessary to protect a legitimate business interest of the employer," a determination that turns on the facts and circumstances of each case. *Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999) (internal quotation omitted). In Illinois, the general rule is that a legitimate business interest exists (1) where a former employee acquired confidential information through employment and subsequently attempted to use it for his own benefit; or (2) where the employer has near-permanent customer relationships and where, but for his employment, the former employee would not have had contact with the customers in

question. *Office Mates 5, North Shore, Inc. v. Hazen*, 599 N.E.2d 1072, 1075, 1080 (Ill. App. Ct. 1992); *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 947 (7th Cir. 1994) (covenants not to compete may only protect "trade secrets, confidential information, and relations with 'near-permanent' customers of the employer"). A restrictive covenant's reasonableness is measured by its hardship on the employee, its effect upon the general public, and the reasonableness of the time, territory, and activity restrictions. *See Liautaud v. Liautaud*, 221 F.3d 981, 987 (7th Cir. 2000) (citing *Decker, Berta & Co. v. Berta*, 587 N.E.2d 72, 77 (Ill. App. Ct. 1992)).

Central contends that it has established a material factual dispute regarding whether the non-compete agreement is necessary to protect Central's confidential information. Def.'s Resp. Br. at 7-8. Central does not argue that the non-compete is necessary to protect near-permanent customer relationships; it relies only on the existence of confidential information to enforce the non-compete agreement. Central argues that its pricing structure, cost information, and design specifications are confidential and that Harris had access to this information. Central contends that Harris's knowledge of this confidential information provides him with an ongoing ability to compete against Central above and beyond other competitors in the marketplace. Def.'s Resp. Br. at 8. Central cites to its employees' testimony as factual support for this position. For instance, Brown (Central's CEO) testified that, in his opinion, the cost of the products Central purchases from its suppliers is confidential, and in some cases, the materials used for the products or the source of materials is confidential as well. Def.'s Resp. PSOF ¶ 58. Central's other witnesses did not have

much to add regarding this issue. John Staley, who Central designated as its corporate representative on the topic of confidential, proprietary and/or trade secret information, testified that Central's cost information remains confidential even after its products are sold in the market. Def.'s Resp. PSOF ¶¶ 6, 59. According to Staley, what Central paid for materials in 2008 and 2009 is still considered confidential in 2010 because prior costs can be used as a benchmark to calculate Central's current costs. Def.'s Resp. PSOF ¶ 59. This is the extent of Central's evidence, and Central contends that it is enough to preclude summary judgment on Harris's claim for a declaratory judgment.

Harris argues that, regardless of the nature of Central's pricing information, the company did not take sufficient steps to protect the information. Pl.'s Reply Br. at 9-10. In determining whether a restrictive covenant should be enforced under Illinois law to protect an employer's confidential information, courts will consider what efforts the employer made to keep the information secret. *See, e.g., Outsource Int'l*, 192 F.3d at 671; *Curtis 1000*, 24 F.3d at 947-48 (a customer list can be a trade secret only if serious efforts are made to keep it secret). "If the firm claiming a protectable interest did not think enough of it to expend resources on trying to prevent lawful appropriation of it, this is evidence that it is not an especially valuable interest, one the firm had incurred *substantial* expense to acquire or create . . . And if the information in which rights are sought is not in fact secret, chances are that the [former employee] would have obtained it lawfully, so that the [employer] hasn't really been much harmed by the employee's defection and again an inference of possible anticompetitive purposes

14

arises." *Curtis 1000*, 24 F.3d at 947-48 (emphasis in original) (citing *Rockwell Graphic Sys. v. DEV Indus.*, 925 F.2d 174, 179 (7th Cir. 1991)).

Central failed to provide the Court with any meaningful argument on this issue in its response brief. Central simply cites to the confidentiality provision included in Central's employee handbook as evidence of its efforts to prevent disclosure of confidential information. Def.'s Resp. Br. at 8. However, the handbook provision, which is all of four sentences, provides no description of what information Central considers confidential with respect to the GKI/Bethlehem Lighting business. Def.'s Resp. PSOF ¶ 46. Indeed, Central admits that it provided no guidance to GKI/Bethlehem Lighting employees about what business information it considered confidential. Def.'s Resp. PSOF ¶ 47. Central simply hopes that its employees will use common "business etiquette" to keep its business information confidential. R. 91-37, Pl.'s Exh. 35 (Staley Dep.) at 52:18-22, 61:3-4. Relying on good manners to prevent disclosure of information will not do in trying to create a protectable interest in confidentiality. Central also admits that during Harris's employment at Central, Harris was the only GKI/Bethlehem Lighting employee required to sign a written agreement to maintain Central's purportedly confidential information. Def.'s Resp. PSOF ¶ 42. Other Central employees with access to information regarding the QVC business, including product cost, sales price, sales volume, and product designs were not required to sign confidentiality agreements. Def.'s Resp. PSOF ¶ 43. Moreover, during Harris's employment with Central, Central's suppliers were not required to keep the details of their business dealings confidential. Def.'s Resp. PSOF ¶ 49. Thus, they were not

restricted from disclosing information about the products GKI/Bethlehem Lighting ordered, including information about the costs charged by the supplier to GKI/Bethlehem Lighting, product features, or the volume of sales. Def.'s Resp. PSOF ¶ 49. Central admits that it is a common practice for seasonal decor suppliers to share information about their customers' orders with other customers, potential customers, and subcontractors who manufacture component parts. Def.'s Resp. PSOF ¶ 53. In light of all of this evidence, the fact that Central's employee handbook contains a basic confidentiality provision fails to create an issue for trial – no reasonable jury would find that the employee handbook provision demonstrates that Central took considerable efforts to keep allegedly sensitive price and cost information confidential.

Central has not met its burden of establishing that the covenant not to compete is necessary to protect a legitimate business interest. Thus, the Court concludes that the non-compete is unenforceable as a matter of law. Harris's motion for summary judgment is granted on Count 1 of his Amended Complaint and Count 1 of Central's Amended Counterclaim.[5]

### 3.

Count 2 of Central's Amended Counterclaim alleges that Harris breached the non-compete agreement by actively competing with Central since his resignation on

---

[5]Harris argues on alternative grounds that the non-compete agreement is unenforceable because it is overbroad. Pl.'s Br. at 12-15. Central did not respond to this argument. *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 522 (Ill. App. Ct. 2005) (employer bears the burden of establishing that the full extent of the restriction is necessary to protect its interests). Because the non-compete is unenforceable for lack of any protectable interest and Central does not defend the reasonableness of the non-compete, the Court will not address Harris's alternative argument in this opinion.

April 17, 2009. R. 63. To state a breach of contract claim under Illinois law, Central must allege (1) the existence of a valid contract; (2) performance of its contractual obligations; (3) breach by Harris; and (4) resulting damages. *Nielsen v. United Servs. Auto Ass'n*, 612 N.E.2d 526, 529 (Ill. App. Ct. 1993). In its motion for summary judgment, Harris argues that Central's breach of contract claim fails because the non-compete agreement is unenforceable. Pl.'s Br. at 15. Harris is correct. Because the Court has concluded that the non-compete is invalid and unenforceable under Illinois law, Central cannot succeed on a breach of contract claim. Harris's motion for summary judgment on Count 2 of the Amended Counterclaim is granted.

### B.

Next, Harris contends that he is entitled to a $100,000 bonus payment under the Illinois Wage Payment and Collection Act (IWCPA), 820 ILCS 115/1 *et seq*. The IWPCA allows for a cause of action based on final compensation wrongfully withheld pursuant to an employment contract or agreement. 820 ILCS 115/2. Final compensation is defined to include "wages, salaries, earned commissions, earned bonuses . . . and any other compensation owed by the employer pursuant to an employment contract or agreement between the 2 parties." *Id.* According to Harris, Central agreed to pay him a bonus in the amount of $100,000 for his work in 2008. PSOF ¶¶ 63, 70. Central does not dispute that the parties discussed a $100,000 bonus, but Central contends that they never reached an agreement on the payment terms of that bonus. DSOF ¶¶ 15, 17, 21. Moreover, Central argues that payment of the bonus was contingent upon Harris entering into a new employment agreement with Central. Def.'s Resp. Br. at 9-

17

12. Both parties move for summary judgment on Harris's IWCPA claim. For the following reasons, the Court denies the motions.

The undisputed facts show that Harris's employment contract does not entitle him to a yearly bonus; bonuses were awarded at Central's discretion. Pl.'s Resp. DSOF ¶¶ 12-13. Although Harris places great emphasis on the fact that he received bonuses in 2006 and 2007, Central's past practice of awarding Harris a year-end bonus does not support Harris's instant IWPCA claim. *See Stark v. PPM Am., Inc.*, 354 F.3d 666, 672 (7th Cir. 2004). Rather, in order to recover under the IWPCA, Harris must demonstrate that the parties mutually agreed to the 2008 bonus payment. 820 ILCS 115/2. The agreement need not be written or memorialized in Harris's employment contract. *Zabinsky v. Gelber Group, Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 2004). Under the IWPCA, "[a]n 'agreement' is broader than a contract and requires only a manifestation of mutual assent . . . parties may enter into an 'agreement' without the formalities and accompanying legal protections of a contract." *Zabinsky*, 807 N.E.2d at 671.

Here, Harris bases his IWPCA claim on an oral agreement allegedly formed on October 31, 2008. PSOF ¶ 63. In late October 2008, Harris met with Central's CEO, William Brown, and then-Senior Director of Human Resources, Stanley Bulger, to discuss Harris's new employment agreement with Central. Pl.'s Resp. DSOF ¶ 16. It is undisputed that at some point during the meeting Harris requested a $100,000 bonus for his work performance in 2008. Pl.'s Resp. DSOF ¶ 17. Indeed, Brown wrote "this year $100,000," which referred to Harris's 2008 bonus, on a whiteboard at the meeting. Pl.'s Resp. DSOF ¶ 19; *see* 91-24, Pl.'s Exh. 22. Also written on the whiteboard

were the proposed terms of Harris's new employment contract with Central. Pl.'s Resp. DSOF ¶ 19. However, from this point, the parties' stories diverge. According to Harris, Brown unconditionally agreed to pay Harris a $100,000 bonus for his work in 2008. PSOF ¶ 63. Harris argues that his understanding is confirmed by the undisputed evidence in the record. Pl.'s Br. at 16-17. First, Harris points to various emails written by Bulger after the bonus was discussed at the October 2008 meeting. Harris claims that these emails confirm that Brown agreed to the bonus. For instance, on November 7, 2008, Bulger wrote that he would have to get back to Harris "on the timing of the $100,000 bonus payment as to whether it will be in mid-December or the beginning of January. [Brown] and I are currently having these discussions involving all bonus payouts." PSOF ¶ 64(b). Similarly, on November 24, 2008, Bulger wrote that "[t]he 2008 bonuses will be paid in mid-December or early January, 2009. The Board of Directors will meet the week after next and decide when the payouts should be made since they have already expressed an expectation to pay all bonuses across the company at the same time." PSOF ¶ 64(c). Harris argues that if the bonus was contingent upon Harris signing a new employment contract, as Central claims, Bulger would not have offered to pay Harris the bonus in January 2009, while contract negotiations were still ongoing. R. 125 (Pl. Resp. Br.) at 4. Harris also presents two spreadsheets prepared by Central's Compensation Committee that list the recommended bonuses for 2008. PSOF ¶¶ 67, 68; Pl.'s Exhs. 26, 28. Both versions of the bonus spreadsheet include Harris's name alongside a figure of $100,000. *Id.* The spreadsheet dated March 25, 2009 also indicates that Harris's bonus had been placed

on hold. PSOF ¶ 68. Harris argues that the emails and spreadsheets demonstrate he is entitled to summary judgment on his IWPCA claim because no reasonable jury could believe that Central would prepare these documents without mentioning that Harris's payment was contingent on signing a new employment agreement, if such precondition actually existed. Pl.'s Br. at 17.

Central advances a very different version of the events that took place between late-October 2008 and Harris's resignation in April 2009. Brown and Bulger testified that the $100,000 bonus payment was contingent upon Harris signing a new, forward-looking employment agreement with Central. Def.'s Resp. PSOF ¶ 63. Brown stated that he spoke to Harris several times about the bonus in January and February 2009, and reminded Harris that the bonus was contingent upon executing his new employment agreement with Central. Def.'s Resp. PSOF ¶ 63, Def.'s Exh. 1 (Brown Dep.) at 114:3-14. Central disputes that the emails from Bulger signify that Central agreed to pay Harris an unconditional bonus of $100,000. Def.'s Resp. PSOF ¶ 64. Rather, Central argues that because the emails and spreadsheets are silent as to the contingency, they are open to multiple interpretations. Def.'s Resp. Br. at 11. Thus, Central contends that it has demonstrated there is a genuine issue for trial, and Harris's motion for summary judgment must therefore be denied.

Despite conceding that the evidence related to Harris's bonus claim likely prevents *either* party from winning summary judgment, Central maintains that its motion for summary judgment on Count 2 should be granted. Harris responds to Central's motion with a condensed version of his own motion for summary judgment,

and contends that the law requires the Court to deny Central's motion and rule in Harris's favor on the IWCPA claim. The Court disagrees because the parties have demonstrated that a reasonable jury could return a verdict for either Harris or Central on this issue.

On the one hand, Harris has produced sufficient evidence to allow a finder of fact to reasonably determine that Central agreed to pay him a bonus for 2008, and then wrongfully withheld the bonus payment after their employment negotiations fell through. The Bulger emails and Compensation Committee spreadsheets do appear to contemplate paying Harris a $100,000 bonus. But, on the other hand, Brown and Bulger testified that these informal communications and documents simply do not reflect a mutual, firm agreement with respect to the 2008 bonus payment. A reasonable finder of fact might elect to believe their testimony because the documents could be interpreted as reflecting ongoing negotiations. Likewise, a reasonable trier of fact might elect to believe Harris's testimony that, contrary to Central's position, his bonus payment was not contingent upon the execution of a new employment contract. Because resolving this material dispute calls for factual interpretations that could go either way, and could also turn on credibility determinations, the Court concludes that neither party is entitled to summary judgment on this issue. Accordingly, Harris's motion for summary judgment on Count 2 of his Amended Complaint is denied, and Central's cross-motion for summary judgment on Count 2 is also denied.

**IV.**

For the reasons stated above, Harris's motion for summary judgment [R. 84] is granted as to Count 1 of the Amended Complaint and Counts 1 and 2 of the Amended Counterclaim; it is denied as to Count 2 of the Amended Complaint. Central's motion for summary judgment on Count 2 of the Amended Complaint [R. 80] is denied.

ENTERED:

Honorable Edmond E. Chang
United States District Judge

DATE: August 1, 2011